UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

CELLPORT SYSTEMS, INC., ET AL.    §
                                  §
v.                                §    CIVIL NO. 4:22-CV-808-SDJ
                                  §
HARMAN INTERNATIONAL              §
INDUSTRIES INC., ET AL.           §

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Harman International Industries Inc.
(Harman) and Harman Becker Automotive Systems GmbH's (HBAS) motion to
dismiss. (Dkt. #23). Central to Defendants' motion is the Settlement and Patent
License Agreement (SPLA) between Plaintiff Cellport Systems, Inc. (Cellport) and
non-parties Samsung Electronics Company, Ltd. (SEC)—Defendants' parent
company—and Samsung Telecommunications America, LLC (collectively, Samsung).
(Dkt. #25-1). However, because the Court's review of a motion to dismiss is limited to
the contents of the pleadings—which did not include the SPLA—the Court converted
the motion to dismiss to a motion for summary judgment pursuant to Federal Rule of
Civil Procedure 12(d). As required by Rule 12(d), the Court gave the parties a
reasonable opportunity to present all material pertinent to the motion. (Dkt. #40
at 5). Having considered the motion and the briefing, the supplemental evidence, and
the applicable law, the Court concludes that (1) it lacks personal jurisdiction over
HBAS and (2) Harman is entitled to summary judgment because the SPLA bars
Plaintiffs' claims.

## I. BACKGROUND

Cellport is a wireless communications and telematics systems developer responsible for the development of the "automotive industry's first universal, hands-free, in-vehicle wireless voice and data communications and telematics system." (Dkt. #1 ¶ 18–19).[1] Cellport is the owner of several patents, including those numbered 6,430,164 ('164 patent); 7,366,892 ('892 patent); 6,341,218 ('218 patent); and 6,377,825 ('825 patent).

Harman and its wholly owned subsidiary, HBAS, manufacture automotive communications, telematics, and infotainment systems. In 2004, HBAS—a German corporation with a principal place of business in Germany—entered into a licensing agreement with Cellport (C-HLA), whereby Cellport granted HBAS and its affiliates licenses to use certain patents related to the technology described above. In March of 2017, Defendants were acquired by non-party SEC.

Cellport alleges that Defendants misused its intellectual property, thereby infringing its patents and violating the C-HLA. It asserts nine different counts against Defendants. Counts One through Four allege various state-law claims, including breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract, and unjust enrichment. Counts Five through Nine allege that Defendants infringed the '164, '892, '218, and '825 patents.

Defendants move to dismiss all claims, arguing that the SPLA—a 2013 settlement agreement between Samsung and Cellport—precludes Cellport's claims.

---

[1] Plaintiff CyberCar, Inc. is a wholly owned subsidiary of Cellport. The Court will refer to Cellport and CyberCar collectively as "Cellport" or "Plaintiffs."

(Dkt. #23). Defendants also assert that the Court does not have personal jurisdiction over HBAS. In the alternative to dismissal, Defendants request that the Court transfer the case to Colorado pursuant to the C-HLA's forum selection clause.

Because the Court found that the "viability of Cellport's claims depends on the applicability of the SPLA to this case," the Court converted Defendants' motion to dismiss to a motion for summary judgment pursuant to Rule 12(d). (Dkt. #40). The Court now considers whether (1) the Court has personal jurisdiction over HBAS and (2) whether Plaintiffs' claims are barred by the SPLA such that Defendants are entitled to summary judgment.

## II. LEGAL STANDARDS

### A. Personal Jurisdiction

A party may move to dismiss an action for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). This defense is premised on the fact that the Court's jurisdiction over a defendant is constrained by due process. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). To pursue a lawsuit against a defendant, a plaintiff must establish that the defendant maintains adequate contacts with the forum state such that haling it to the State to defend itself would neither be "[un]reasonable" nor offend "traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358, 141 S.Ct. 1017, 209 L.Ed.2d 225 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Although the burden rests with the plaintiff to establish the core elements of personal jurisdiction, the plaintiff can satisfy that burden at the pleading stage by

simply presenting a prima facie case for jurisdiction. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). "Allegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by [a] defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F.Supp.2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282 n.13 (5th Cir. 1982)).

## B. Motion for Summary Judgment

Because the Court converted Defendants' motion to dismiss to a motion for summary judgment pursuant to Rule 12(d), the summary judgment standard applies here. *See Allen v. Hays*, 812 F.App'x 185, 189 (5th Cir. 2020) (explaining that the Rule 56 summary judgment standard applies to conversions to Rule 12(b)(6) motions). "Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 477 (citing *Anderson*, 477 U.S. at 248).

Courts consider the evidence in the light most favorable to the nonmovant, but the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by providing particular facts showing that there is a genuine issue for trial. *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

## III. DISCUSSION

Defendants assert that the SPLA precludes all claims against them and that the Court does not have personal jurisdiction over HBAS. Because "[p]ersonal jurisdiction . . . is an essential element of the jurisdiction of [the Court], without which the [C]ourt is powerless to proceed to an adjudication," the Court must determine whether it has personal jurisdiction over HBAS before deciding whether the SPLA bars Cellport's claims. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 231–32 (5th Cir. 2012) (cleaned up).

**A.  The Court Lacks Personal Jurisdiction Over HBAS.**

Personal jurisdiction over a defendant can be established under two general theories—either general jurisdiction, which refers to the Court's "all-purpose" jurisdiction over defendants that are essentially at home in the forum state; or specific jurisdiction, which refers to "case-linked" jurisdiction arising from a defendant's activities directed toward the forum state. The Court has neither general nor specific jurisdiction over HBAS.

General jurisdiction exists when the defendant's contacts with the forum state are "so continuous and systematic as to render [the defendant] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) (cleaned up). In general, "a corporation's 'home' falls in two paradigmatic places: (1) the state of incorporation and (2) the state where it has its principal place of business." *Frank v. P N K (Lake Charles) L.L.C.*, 947 F.3d 331, 337 (5th Cir. 2020).

Cellport acknowledges that HBAS is a German corporation with a principal place of business in Germany. (Dkt. #1 ¶ 8). Nonetheless, Cellport asserts that this Court has general jurisdiction over HBAS because HBAS purportedly has conducted "substantial business in the State of Texas and this judicial district, including regularly doing or soliciting business in Texas, and/or engaging in persistent conduct and/or deriving substantial revenue from goods and services provided to customers in Texas." (Dkt. #1 ¶ 15). Because Cellport's broad allegation "merely amount[s] to [a] vague and overgeneralized assertion[] of contacts that give[s] no indication as to the extent, duration or frequency of [HBAS's] contacts," the Court does not have

general personal jurisdiction over HBAS. *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018) (cleaned up).

"Specific jurisdiction arises when the defendant's contacts with the forum 'arise from, or are directly related to, the cause of action.'" *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002) (citation omitted). The Court evaluates specific jurisdiction using a "three-step" procedure. *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021). First, the plaintiff must demonstrate that the defendant has minimum contacts with the forum state—meaning that the defendant purposefully directed its activities at the forum state and availed itself of the privilege of doing business in the State. *Id.* Second, the plaintiff must demonstrate that the causes of action asserted against the defendant arose from the defendant's contacts with the forum state. *Id.* And third, after the plaintiff establishes the first two requirements, the burden then shifts to the defendant to prove that maintaining a lawsuit in the forum state would be either "unfair" or "unreasonable." *Id.*

To establish minimum contacts, Cellport must show that HBAS "purposefully availed [itself] of the benefits and protections of [Texas] such that [it] should reasonably anticipate being haled into court there." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (cleaned up). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* at 193–94 (quoting *Burger King Corp.*, 471 U.S. at 475).

Cellport hinges its minimum contacts argument on the "stream of commerce" theory. "That doctrine recognizes that a defendant may purposely avail itself of the protection of a state's laws—and thereby will subject itself to personal jurisdiction—'by sending its goods rather than its agents' into the forum." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 778 (5th Cir. 2018) (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011)). To succeed under this theory, a plaintiff "need only show that [the defendant] delivered the product that injured [it] 'into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.'" *Id.* at 779 (quoting *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013)); *see also Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) ("This court has consistently held that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'" (citation omitted)).

Cellport's theory of specific jurisdiction over HBAS fails. In its complaint, Cellport identifies a number of products that it alleges have made their way to Texas, which it argues demonstrates the "offering and sale of Harman products by . . . HBAS in the United States." (Dkt. #34 at 30). However, HBAS's declarant, Christian Kolb, confirms that "[HBAS] has not conducted business in Texas, and has not solicited business in Texas, or derived revenue from products provided in Texas," and that it has not "designed, manufactured, sold, or offered for sale any accused product in

Texas or done any business relevant to the Complaint allegations in Texas." (Dkt. #23-1 ¶ 4). Kolb further attests that HBAS has not "transferred or shipped [the accused products] in or to Texas[,] [n]or has [HBAS] sold any of these products to any entity located in the United States or shipped any of these products to any customer location in the United States." (Dkt. #23-1 ¶ 6). Kolb also states that HBAS has not performed any of the alleged misconduct in Texas. (Dkt. #23-1 ¶¶ 8–10).

As Cellport acknowledges, Kolb's declaration directly contradicts its allegations. "[W]hen unsubstantiated allegations are controverted by affidavit or declaration, the affidavit or declaration trumps the allegations." *In re Norplant Contraceptive Prods. Liab. Litig.*, 899 F.Supp. 315, 317 (E.D. Tex. 1995); *see also Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("[T]he allegations of the complaint are taken as true except as controverted by the defendant's affidavits."). Cellport points to importation records and activities of HBAS's affiliates to show that Kolb's declaration is false and that HBAS has purposefully availed itself of Texas's benefits. However, as Defendants correctly note, the evidence Cellport proffers is unrelated to the accused products, unrelated to HBAS, and/or unrelated to Texas.

First, while one importation record shows that HBAS has imported some goods into Texas, it does not show that HBAS imported the accused products. (Dkt. #34-1). Thus, the second prong of the personal jurisdiction analysis is not met because these products are not the bases of Cellport's claims. *See Admar Int'l, Inc.*, 18 F.4th at 786.

Second, much of the remaining evidence Cellport proffers does not relate to HBAS specifically. For example, Cellport points to another importation record demonstrating that HBAS's affiliate—not HBAS itself—imported products to Texas. Indeed, throughout its briefing, Cellport heavily relies on the fact that entities associated with HBAS placed the accused products into the stream of commerce. (Dkt. #34-2); *see* (Dkt. #39 at 12) ("HBAS has placed its accused products in the stream of commerce, *through its affiliates*, including [Harman], and the distribution systems of *third parties*, and those products, while flowing down the commercial stream, have ended up in Texas, the location of [Harman], its parent company and American affiliate." (emphasis added)).

The problem with haling HBAS into court in Texas based on the alleged actions of its parent company, Harman, or any other affiliate is that, "[g]enerally, 'the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated.'" *Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 251 (5th Cir. 2019) (quoting *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004)). As the Fifth Circuit has explained, this "presumption of institutional independence" can be rebutted "by 'clear evidence,' which requires a showing of 'something beyond' the mere existence of a corporate relationship between a resident and nonresident entity." *Id*. (quoting *Freudensprung*, 379 F.3d at 346).

Cellport does not even attempt to make such a showing. It fails to allege any facts demonstrating an alter-ego relationship between HBAS and Harman or any other affiliate. Instead, this case aligns with cases in which courts have found a "passive parent-subsidiary relationship" that is "insufficient to support jurisdiction." *In re DePuy Orthopaedics*, 888 F.3d at 780; *see also Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 339 (5th Cir. 1999) (observing that "the mere fact that a corporate relationship exists is not sufficient to warrant the assertion of jurisdiction over a related corporate entity" and finding that plaintiff had "failed to carry the burden of establishing a prima facie showing of sufficient control to establish an alter-ego or agency relationship" between the entities). Thus, the fact that Harman and other HBAS affiliates import products or have other ties to Texas is insufficient to impute personal jurisdiction over HBAS.

In sum, the Court finds that Cellport has failed to offer sufficient evidence to contradict Kolb's declaration, and thus his declaration is accepted as true. Unable to show that HBAS placed accused products in the stream of commerce knowing they would end up in Texas, Cellport relies on the activities of HBAS's affiliates. But, as explained above, a mere affiliation with a corporation that has interacted with Texas is insufficient to establish that the Court has personal jurisdiction. Therefore, the Court finds that it does not have personal jurisdiction over HBAS.[2]

---

[2] Cellport also argues that HBAS's interactions with the Federal Communications Commission (FCC) regarding the approval of its products and the fact that vehicles that use "Harman products" are distributed "throughout the United States, including Texas," establish personal jurisdiction over HBAS. (Dkt. #39 at 12–13). Both arguments fail. First, HBAS's communications with the FCC have nothing to do with Texas. This argument is an irrelevant tributary to Cellport's flawed stream-of-commerce theory. Second, the exhibits

**B. The SPLA Precludes Plaintiffs' Claims.**

Defendants also argue that the release in the SPLA bars Cellport's claims against them. Since the Court determined that it does not have personal jurisdiction over HBAS—and thus has no power to adjudicate the merits of Cellport's claims against it—the Court will only consider whether the SPLA precludes Cellport's claims against Harman.

Before considering the language of the instrument, the Court must first determine which state's laws apply. The SPLA designates Colorado as the choice-of-law state. (Dkt. #25-1 ¶ 15). "Where parties have contractually agreed to a choice-of-law provision, Texas choice-of-law rules favor enforcement of these provisions, unless the provision violates a fundamental public policy of Texas." *See Mission Specialty Pharmacy, LLC v. OptumRx, Inc.*, 154 F.Supp.3d 453, 458 (W.D. Tex. 2015) (cleaned up). The Court finds that the choice-of-law provision here does not violate any fundamental Texas public policy. Thus, the Court will interpret the SPLA pursuant to Colorado law.

Under Colorado law, contract interpretation is a question of law for the Court. *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022). As particularly

---

Cellport proffers to show that HBAS products are found in cars that might be sold in Texas refer to neither HBAS *nor* Texas. Instead, as Cellport acknowledges, these exhibits identify "Harman customers" and "Harman products." (Dkt. #39 at 12–13). But, as explained above, the Court cannot exercise jurisdiction over HBAS for the activities of third parties. *Carmona*, 924 F.3d at 193–94 (explaining that a defendant cannot be "haled into a jurisdiction" as a result of the "unilateral activity of another party or a third person"). Further, these exhibits do not controvert Kolb's attestation that HBAS "has not conducted business in Texas, and has not solicited business in Texas, or derived revenue from products provided in Texas," and that it has not "designed, manufactured, sold, or offered for sale any accused product in Texas or done any business relevant to the Complaint allegations in Texas." (Dkt. #23-1 ¶ 4).

relevant here, Colorado defines a release as "the relinquishment of a claim to the party against whom such claim was enforceable. . . . Once a claim is released, the release bars the injured party from seeking further recovery." *CMCB Enters., Inc. v. Ferguson*, 114 P.3d 90, 96 (Colo. App. 2005). And like other contracts, Colorado law requires courts to examine the parties' intent to determine the scope of a release. *See French*, 509 P.3d at 449 ("In interpreting a contract, our primary goal is to give effect to the parties' intent."); *CMCB Enters.*, 114 P.3d at 96 ("A court is to construe a release to effectuate the manifest intention of the parties."). "[I]ntent is primarily determined from the language of the instrument itself." *French*, 509 P.3d at 449. So long as the language is unambiguous, the contract is deemed to express the parties' intent and must be enforced according to its terms. *Id.*; *see also CMCB Enters.*, 114 P.3d at 96 ("[C]onstruction [of a release] rests on good sense and plain understanding of the words used."). "The mere fact that the parties disagree as to the proper interpretation of a contract does not itself establish an ambiguity in the contract." *French*, 509 P.3d at 449.

As an initial matter, the Court finds that the SPLA is unambiguous. Although the parties dispute whether the SPLA applies to Harman and whether Cellport's claims here are contemplated by its terms, neither party asserts that the terms are unclear. Therefore, the Court will interpret the SPLA according to its plain language. *Id.*

In relevant part, the release reads:

Cellport, on behalf of itself and its Affiliates, for themselves and their successors and assigns, hereby irrevocably, fully, finally releases,

> forever discharges, and covenants not to sue [Samsung] and each of [its] Affiliates . . . from any and all claims, actions, causes of action, suits, damages, injuries, duties, rights, obligations, liabilities, adjustments, responsibilities, judgments, trespasses and demands (collectively), whatsoever, in law or in equity, whether known or unknown, suspected or unsuspected to exist, now existing or later acquired, which were made or could have been made or may be made in the future by Cellport relating to the Licensed Patents.

(Dkt. #25-1 ¶ 7(b)).

Recall that the SPLA went into effect in 2013—prior to SEC's acquisition of Defendants. However, the language here applies to both Samsung (including SEC) and Samsung's Affiliates—defined as "any person, corporation, partnership, trust or other entity that, now or in the future, directly or indirectly, legally or beneficially, owns, is owned by, is under common ownership with or is under direct or indirect control of the Party or the Party's owner or ultimate parent." (Dkt. #25-1 ¶ 3). "Party" includes either Samsung or Cellport. (Dkt. #25-1 at 2). Neither party disputes that Harman was acquired by SEC in 2017. Therefore, Harman is "owned" by SEC. And although Harman was acquired *after* the parties signed the SPLA, the agreement explicitly states that later-acquired corporations are "Affiliates" for purposes of the agreement. Thus, the SPLA applies to Harman. *See Oyster Optics, LLC v. Infinera Corp.*, 843 F.App'x. 298, 300 (Fed. Cir. 2021) (noting that the language "now or in future" in a settlement agreement made the timing of the subsidiary's acquisition immaterial).

Having found that the SPLA applies to Harman, the Court turns to the terms of the release. As Cellport correctly notes, "licenses of patent rights are generally interpreted as prospective, and releases for infringement as retroactive, absent clear

14

language demonstrating a contrary intent." (Dkt. #34 at 11) (citing *Oyster Optics*, 843 F.App'x at 302). However, the plain language here *does* demonstrate a contrary intent: the release states that it applies to "now existing or *later acquired*" claims, which "were made or could have been made or *may be made in the future*." (Dkt. #25-1 ¶ 7(b)) (emphasis added). By its terms, the release rejects the general rule and embraces a forward-looking discharge of liability. *Cf. Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999) ("The phrase 'may have' is necessarily future-oriented. In the context of the Settlement Agreement, it implies a *future possibility* of [the plaintiff] having a claim."); *see generally* (Dkt. #25-1 at 2) ("Samsung wishes to obtain a license and release for any and all past, present, and *future actions* of Samsung and its Affiliates . . . with respect to the [Licensed Patents] . . ., and Cellport is willing to grant such a license and release." (emphasis added)).

Next, the Court must determine whether the release covers Cellport's claims against Harman. Through the SPLA, Cellport released "any and all claims . . . whether known or unknown, suspected or unsuspected to exist, . . . relating to the Licensed Patents." (Dkt. #25-1 ¶ 7(b)). "Licensed Patents" means both "First Licensed Patents"[3] and "Second Licensed Patents." (Dkt. #25-1 ¶ 2). "Second Licensed Patents" include the '164 patent, the '892 patent, the '218 patent, and the '825 patent—the patents Harman allegedly infringed. (Dkt. #25-1 at 14); *see* (Dkt. #1 at 78–119). These claims certainly "relate to" the Licensed Patents, and thus they were released.

---

[3] First Licensed Patents are not in issue here.

Counts One through Four are premised on state law. In Count One, Cellport asserts that Harman breached the C-HLA, particularly by allegedly failing to comply with its obligation to pay royalties for Licensed Products made under the Licensed Patents, as those terms are used in the C-HLA. Count Two asserts a claim for breach of the duty of good faith and fair dealing against Harman, and is another claim focused on Harman's alleged "fail[ure] to pay the royalties specified in the [C-HLA] for all Licensed Products practicing the Licensed Patents" and for "using, without authorization, unlicensed Cellport Intellectual Property in Harman products." (Dkt. #1 ¶ 261). Count Three asserts a tortious-interference-with-contract claim premised on Harman's alleged obstruction of HBAS's compliance with the C-HLA. And Count Four asserts an unjust-enrichment claim arising from Harman's purported "unlicensed and unauthorized use and conversion of Cellport's Licensed Patents and Cellport Intellectual Property." (Dkt. #1 ¶ 271).

Harman argues that all of Cellport's state-law claims asserted in Counts One through Four are grounded in Harman's use of the Licensed Patents under the SPLA. (Dkt. #23 at 10 n.2); (Dkt. #38 at 5). In the C-HLA, Cellport granted HBAS and its affiliates a license "under the Licensed Patents" (listed in Schedule A of the document) to make certain Licensed Products in exchange for royalties. (Dkt. #1-2 ¶¶ 2.1, 3.1). The Licensed Patents to which the C-HLA refers are listed in the SPLA and contemplated in the release.[4] And it is Harman's alleged failure to comply with

---

[4] Schedule A of the C-HLA includes two European Patents that are not listed in the SPLA. Cellport does not allege that Harman breached its duties with respect to these patents.

its obligation to pay royalties and its alleged misuse of the Licensed Patents that underly all of Cellport's state-law claims. Thus, each of Cellport's state-law claims is grounded in Harman's purported breach of some duty related to the patents expressly covered in the SPLA's release.

Cellport does not dispute that its state-law claims directly relate to the patents listed in the SPLA. Instead, it argues that such relation does not matter here because the SPLA only covers claims for patent infringement and does not encompass its state-law claims. (Dkt. #34 at 12).[5] The plain language of the SPLA refutes Cellport's position. The release is not cabined to just claims of patent infringement, but instead covers "any and all claims . . . *relating to* the Licensed Patents." (Dkt. #25-1 ¶ 7(b)) (emphasis added). "Relate to" is a broad term meaning "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting BLACK'S LAW DICTIONARY 1158 (5th ed.1979)). And Colorado courts have repeatedly interpreted contract terms like "relating" or "relate to" as encompassing all issues surrounding the underlying subject matter. *See, e.g.*, *City & Cnty. of Denver v. Dist. Ct.*, 939 P.2d 1353, 1366 (Colo. 1997) (giving broad definition to the phrase "relating to" in an arbitration agreement). The Court

---

[5] Cellport also argues that Harman's products at issue in this suit are not "Licensed Products" under the SPLA and thus are not released. However, the release itself makes no reference to Licensed *Products*—only to Licensed *Patents*. Whether an item is a Licensed Product is relevant to the license granted in the SPLA, but not to the release. For this same reason, Cellport's assertion that "[t]he only claims that are discharged and released by the SPLA are claims for . . . infringement by Samsung products as they were configured at the time of or prior to settlement," (Dkt. #34 at 13), also fails.

concludes that, under Colorado law, this wording embraces any claim—patent infringement or otherwise—that relates to the patents in issue. As explained above, the state-law claims are related to the patents.

Cellport also argues that the state-law claims are not released by the SPLA because they "relate to Harman products defined narratively in the C-HLA; they are not based on the 'infringement' of a claim of the Licensed Patents." (Dkt. #39 at 6). Again, however, the plain language of the release makes clear that it is not limited to infringement claims. Thus, it is immaterial whether the state-law claims are based on the "infringement" of a Licensed Patent. It is enough that the claims are related to the patents. Cellport does not dispute that they are.

Based on the foregoing, the Court concludes that, according to the plain language of the SPLA, (1) Harman is an "Affiliate," such that it is covered by the SPLA; (2) the release applies to claims arising after the SPLA's inception; and (3) all of Cellport's claims relate to the Licensed Patents and were thus released.

Cellport argues that this reading is impermissible because, if true, it renders the SPLA's license provision meaningless. *See* (Dkt. #34 at 13–14). Not so. Cellport fails to recognize that licenses and releases serve two distinct purposes. *See Oyster Optics*, 843 F.App'x at 302–03 (rejecting a similar contention that the court's reading rendered "the release provision superfluous" because "the release is broader than the license and does other work in the agreement"). The SPLA's license provision grants Samsung and its Affiliates the explicit right to use the Licensed Patents to create Licensed Products. By contrast, the release bars suit for any claim relating to the

Licensed Patents, irrespective of whether Samsung or its Affiliates make Licensed Products. Thus, the release is broader than the license, reinforcing Samsung's and its Affiliates' abilities to use the Licensed Patents without any fear of future liability.[6]

Cellport essentially asks the Court to rewrite and narrow the release's explicit terms. As Colorado law recognizes, this Court has no such power. *See, e.g.*, *Fox v. I-10, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998) ("The court's duty is to interpret and enforce contracts as written between the parties, not to rewrite or restructure them."); *Yamin v. Levine*, 120 Colo. 35, 38, 206 P.2d 596, 597 (1949) ("If the contract clearly expresses the intentions of the parties, it must be construed as written . . ."); *Gertner v. Limon Nat'l Bank*, 82 Colo. 13, 41, 257 P. 247, 257 (1927) (stating that "[c]ourts do not make contracts for parties" and "do not open their doors to those that are suffering merely from their own bad bargains"). Consistent with these principles, the Court will enforce, rather than revise, the SPLA's plain language. *See CMCB Enters.*, 114 P.3d at 96 ("[C]onstruction [of a release] rests on good sense and plain understanding of the words used.").

In a final bid to evade the SPLA's unequivocal language, Cellport argues that Harman is equitably estopped from relying on the SPLA because it is in breach of what it contends is a material representation found in the SPLA. (Dkt. #34 at 14–15). Cellport references paragraph 19 of the SPLA, which provides as follows:

> Cellport represents that the products made, sold, used and/or imported by Samsung and its Affiliates, as they are presently (and have heretofore

---

[6] This litigation is a prime example of why Samsung may have wanted to include a forward-looking release in addition to obtaining a license. Whereas the release bars suit, a mere license would have required the Court to undertake an intensive factual analysis into the allegedly infringing items and the circumstances of their creation.

been) configured, do not infringe any of the Second Licensed Patents, nor are they within the scope of any anticipated claim in any patent application, which Cellport owns or has the right to assignment. Samsung represents that Samsung and its Affiliates do not make or sell electronic control units for automotive telematic systems.

(Dkt. #25-1 ¶ 19).

Cellport argues that this language created an express warranty, which Harman has violated by making electronic control units (ECUs). It points to Colorado's Uniform Commercial Code (UCC), which states that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." COLO. REV. STAT. § 4-2-313(1)(a). According to Cellport, Harman's violation prevents it from using the SPLA to defend against Cellport's claims. This argument fails for at least three reasons.

*First*, Cellport's reliance on the UCC is misplaced. The UCC typically applies only to the sale of goods, and the specific provisions invoked by Cellport make clear that the general rule applies here. *See* COLO. REV. STAT. § 4-2-313(1)(a) (discussing express warranties created in the sale of goods); *id.* § 4-2-102(1) (confirming that, "[u]nless the context otherwise requires," Colorado's UCC provisions apply only to "transactions in goods"). The SPLA is not a "transaction[] in goods," it is a settlement and patent license agreement. The UCC has no application to such an agreement. *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1359 n.2 (Fed. Cir. 2005) (holding that UCC did not apply to patent license); *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d

1177, 1182–83 (Fed. Cir. 1999) (holding that UCC did not apply to settlement agreement from patent infringement suit).

*Second*, Harman has not violated paragraph 19 of the SPLA, Cellport has misread it. On its face, paragraph 19 reflects present-tense representations by Cellport itself, as well as Samsung, not representations as to future conduct. In paragraph 19, Cellport specifically represents that, at the time the SPLA was executed, Samsung and its Affiliates' products, "as they are presently (and have heretofore been) configured," "do not infringe" any of Cellport's referenced patents. (Dkt. #25-1 ¶ 19). Samsung, in turn, made a reciprocal, present-tense representation that "Samsung and its Affiliates do not make or sell electronic control units for automotive telematic systems." (Dkt. #25-1 ¶ 19). Even assuming *arguendo* that, years later, Harman has made ECUs, Harman (and Samsung, for that matter) did not represent in paragraph 19 of the SPLA that they would never make ECUs. Instead, Samsung merely confirmed that, when the SPLA went into effect in 2013, Samsung and its Affiliates did not make or sell such items. This is plainly not a future representation, which the parties demonstrated elsewhere they were fully capable of making—see, e.g., the release provision. Again, Cellport's argument attempts to change the SPLA's language, transforming Samsung's present-tense representation in paragraph 19 into a promise of future conduct. For the reasons already stated, the Court will not rewrite the SPLA's terms.

*Third*, the SPLA explicitly identifies mutual representations and warranties elsewhere, and that provision includes no prohibition on the making or selling of

ECUs. *See* (Dkt. #25-1 ¶ 13). For these reasons, the Court finds that Harman is not equitably estopped from relying on the SPLA.

*   *   *

In sum, the Court concludes that HBAS does not have the requisite minimum contacts with Texas for this Court to exercise jurisdiction over it. Therefore, the Court will dismiss all claims against HBAS. Cellport's remaining patent infringement and state-law claims against Harman were released by Cellport in the SPLA and are thus barred. *See CMCB Enters.*, 114 P.3d at 96 ("Once a claim is released, the release bars the injured party from seeking further recovery"); *see also CIC Prop. Owners v. Marsh USA Inc.*, 460 F.3d 670, 673 (5th Cir. 2006) (affirming the district court's grant of summary judgment after concluding that a release barred the claims at issue); *Smith v. Amedisys Inc.*, 298 F.3d 434, 445–46 (5th Cir. 2002) (same); *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 936–37 (5th Cir. 1994) (same); *Foremost Cnty. Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 761 n.11 (5th Cir. 1990) (noting that a release "eliminates any liability"); *Nat'l Am. Ins. Co. v. Melancon*, No. Civ.A. 98-1273, 1999 WL 600372, at *3 (E.D. La. Aug. 9, 1999) (noting that a release destroys a cause of action).[7] Therefore, the Court finds that Harman is entitled to summary judgment.

---

[7] Harman alternatively relies on the SPLA's covenant-not-to-sue provision. However, because the release fully resolves this case, the Court need not consider whether the covenant not to sue would also preclude Cellport's claims.

## IV. Conclusion

For the foregoing reasons, the Court concludes that it does not have personal jurisdiction over HBAS. The Court also finds that Harman is entitled to summary judgment.

Therefore, it is **ORDERED** that Defendants' Motion to Dismiss, (Dkt. #23), which the Court converted to a motion for summary judgment, (Dkt. #40), is **GRANTED**. Plaintiffs' claims against HBAS are **DISMISSED** for lack of personal jurisdiction. Plaintiffs' remaining claims against Harman are **DISMISSED with prejudice**.

So ORDERED and SIGNED this 28th day of March, 2024.

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE